Thank you. Before we begin, I have a couple of preliminary matters. The Court will take a break after the second argued case, that is, after United States v. Wagee, in order for the courtroom to clear and things to be reconfigured for the final case of the morning. Also, we welcome a number of externs that are here with Kelly Zusman, and we will be delighted to meet with them after our post-argument conference. And anyone else is absolutely welcome to stay for that as well. We don't discuss any cases or legal issues, but we talk about the Court and answer questions. So with those preliminary thoughts, we are ready for our calendar, and the first case, Kulanak v. Barr, has been submitted on the briefs. So we begin oral arguments with Marshall v. Commissioner of Revenue. Robert Weber May it please the Court, my name is Robert Weber. I'm here this morning with co-counsel Robert Chacoin and Robert Deckel, and we are here on behalf of two brothers, one now deceased, and their wives, who ran a very small excavation business in Portland. And after a 20-year legal battle with the Bureau of Reclamation, were awarded $40 million. That legal battle nearly put them out of business. And they took that award to their lawyers and accountants and asked for their advice on what to do with it. These taxpayers are unlike almost every other taxpayer you've read about in these MIDCO cases. That's especially true of the Diebold case, which was the touchstone for the tax court. Diebold, and later this court in Salus Mundi reviewing that case, stressed over and over again the taxpayers' sophistication. Those taxpayers themselves were lawyers, bank officers, trust departments. But that doesn't make any difference, does it? Because the sophistication of the advisors are imputed to the client, isn't it? We do not believe the sophistication of the advisors can be attributed to the client. But what my point is, Judge Toshima, is that the taxpayers themselves were highly sophisticated. Here I would suggest to you the only thing that these taxpayers are perhaps sophisticated in is moving a large amount of dirt from one place to another. And in that sense, we put them in the same spot that the Starns taxpayers were, which were the owners of a trucking company. And what we are asking this court to do is what neither the commissioner nor the tax court did, to undertake the precisely cadence, step-by-step analysis required to assess a claim of transfer reliability. There are two distinct components. They're recited in the Stern case of 1935. They are still law. They are easily recited. And I would suggest to you they are not always carefully applied by courts reviewing MIDCO cases. So I would like to turn first to the second component of the Stern test, which is whether or not these taxpayers, whether or not the commissioner, whether or not, let me rephrase that, any creditor could do what the commissioner is seeking to do here because that's the test. It's not the IRS unique authority. It has to apply to every particular creditor. The first question there would be this, I would suggest. Would Oregon law allow any ordinary creditor to collapse these three separate transactions on the basis of constructive knowledge? At page 41 of his brief, the commissioner makes the bold statement that it would and cites no case. The tax court looked at no case law and reached the same end. The Oregon Supreme Court has not squarely looked at collapsing in the context of UFTA, the Uniform Fraudulent Transfer Act, but that's not unusual in MIDCO cases. The point is there is no case in Oregon that gives the commissioner authority to do what he wants. Well, the commissioner has to make an educated guess about what Oregon law is because they're required to look to state law on that. And the majority rule, by far the heavily majority rule, is what the commissioner says. So what is the basis for thinking that Oregon would adopt the minority rule and not consolidate these transactions? I would answer that two ways, Your Honor. First of all, what the tax court did here, I want to be clear what the tax court did. What the tax court said is we predicted Ohio law based on three federal cases, number one. Then they said UFTA, the Unlawful Fraudulent Transfer Act, the Uniform Fraudulent Transfer Act, is the same between Oregon and Ohio. Therefore, Oregon would follow our prediction on Ohio. It is an extremely strained. Well, it's not that strained. It's a uniform act that's been adopted in a number of states, and the cases have involved Ohio and Tennessee and other states. And you don't seem to be quarreling with the idea that that seems to be the majority rule. Agreed. And I don't quarrel with that, but I want to be clear what we're talking about here. Here's what the commissioner wants to do. He wants to first go to the stern rule that says state law. First of all, you have to find a completely separate ground under Oregon law to collapse these transactions before you ever look to UFTA. And so, yes, UFTA is uniform, but that doesn't make any difference when it comes to collapsing. There is no collapsing provision within UFTA. You have to find a completely separate legal authority in the state of Oregon to do that, and if you are successful in collapsing, then you can turn to UFTA. And the other thing the commissioner is doing here is saying this, that we are going to collapse on the basis of constructive knowledge. I think the service still says that you don't even need a finding of constructive knowledge, but we're going to collapse on the basis of constructive knowledge. In other words, they don't need to know that they're doing anything wrong, the taxpayers, and then we're going to cram it into that only provision of UFTA that is strict liability. There is no Oregon case that says that. And to answer the second part of your question, Judge Graber, Oregon is a minority state. Oregon requires actual knowledge for collapsing. We have cited numerous cases to that effect. The Supreme Court here has never reviewed this calculus that the commissioner is advocating here, and that wasn't done by the tax court either. So are you suggesting indirectly that certification to the Oregon Supreme Court would be the right answer for us? Well, I want you to reverse this because my clients... Well, I know you do. My clients are quite... But, you know, if the question is one that the Oregon courts have not dealt with, which is what your argument has been up until this moment, and if you think it's in doubt, why wouldn't we ask? I'll give you an out. Courts are required to look. This court is required to look at the decisions of the intermediate courts on this subject. And adopt those, assume that those are still the law, unless you're satisfied that the Oregon Supreme Court would reject them. And that is not the case. We have a hundred-year-old common law tradition here that in cases of collapsing, not in this context, but every other context, specific intent, intentional, willful knowledge has been required before Oregon ever allowed that to happen. And there are both Supreme Court and Court of Appeals cases that say that. And that's before you ever get to Cushman. And so the question is, would Oregon to Supreme Court abandon that tradition? Would they now go down this road that the tax court has predicted based on a prediction of the Ohio law and say it is should-have-known kind of knowledge? So I think this court has all the wherewithal and authority to look at this in a de novo form, which you're required to do, which we're asking you to do here. But what about certifying it to the Oregon Supreme Court? A question not anticipated, Your Honor. But my answer to that is that would be my fallback, I suppose, as opposed to affirming this. But as I have said, I think that this court, de novo, based upon the two paragraphs in the tax court opinion that did the entire legal analysis of Oregon law, I think that this court could say that was error, looking at this de novo. So I'm not opposed to that, but I'm not seeking that, if that's fair. Oregon is not a constructive knowledge state, and it's error for the court to have assumed that. And Cushman is an important case in this analysis. To predict that the Oregon Supreme Court would now collapse on the basis of constructive knowledge, when it never has done so before, would mean, as I said, to abandon this 100-year-old tradition. Cushman rejected objective knowledge as sufficient to establish liability under UFTA. That is a very compelling case. It has been on the books for 25 years, and I would suggest, Judge Temeshima, that, in fact, if Oregon Supreme Court was going to reverse Cushman, it's had 25 years to do so. I think you can assume that Oregon is going to go along with everything that's been going on for the last 100 years. Now, let's assume that Oregon is a constructive knowledge state. On what basis did the tax court find it? There were really two. It said that these taxpayers were warned by their lawyers, Schwabby, Williamson, and Wyatt, and they were also warned by their accounting firm, PricewaterhouseCooper. On both counts, the tax court committed clear error, and I wanted to turn to that now. But before, I want to be clear about what this knowledge has to be of. And the best definition of that you can find in Starnes at footnote 5, which recites an important piece of authority here, which is further guidance on these intermediary transactions in 2008 by the IRS. And what they said is, when we're looking to deny the tax treatment that the taxpayers are looking for in these intermediate cases, the one thing we want to know is, did the taxpayers know that the taxes would not be paid? That's the critical fact. That note, to be fair, also says, know or should have known, but because Oregon is an actual knowledge state, that doesn't apply here. I would suggest even if it was should have known, there was no way that they should have known what these Fortran people were about to do because Fortran repeatedly lied to the taxpayers and to their lawyers. Price Waterhouse. Didn't one of their advisors actually warn them, almost in so many words, not to do the transaction? No, sir. They came pretty close, right? No, sir. Didn't someone from Price suggest this was not a good idea? Isn't that what the tax court found? That's what the tax court found, and I would suggest to you that the record would refute that. Okay, but let's start there. So the tax court did find that, correct? No, no. The tax court, I think what they testified to, the tax court's findings were that they were warned in some fashion about this. Well, here's what they were warned about. Price Waterhouse, all they ever said was after they discovered this 2001-16 advice, they said that this could be similar or is similar to one of those transactions. That's number one. Then I think the other accountant, Weber, that was Dempsey I first spoke of, but Weber said that I told the taxpayer if it were me, I wouldn't do it. Now, all of that is refuted by two pieces of evidence. Hold on. Stop right there. So first, for us to agree with you right now with what you're going to go do next, we have to find the tax court clearly erred, correct? Correct. Okay, just so we're clear on the standard overview. Okay, we may proceed. So for 20 years, MAC was mostly dormant because it was tied up with this Bureau of Reclamation case and that impacted its bonding ability, and in March of 2002, they received finally an award of $40 million. By that time, Richard Marshall had suffered a debilitating stroke, and so John Marshall took this to their longtime accountant, and the Marshalls were at a crossroads at that point. They were in their 60s. Richard was not coming back, and the question was, do we try to start up again because we've been handicapped with our bonding associated with this litigation or not? And so Mr. Dempsey came up with a number of options, such as converting it to a sub-S, refreshing the net operating loss, or even selling the stock. And so John Marshall was thinking about that when unsolicited, distinction from many of the other cases, unsolicited Fortran approaches him and he goes back to Dempsey. Mr. Dempsey does a pros and cons memo that is recited repeatedly in our briefing because it's important. None of those pros and cons talked about tax avoidance, tax shelters, or any of the kind of things that say Tricarici, if I'm pronouncing that right, and even in Sloan, the facts there were contrary to that. There was no approach to avoid taxes. Yes, minimization might be part of this, but that was not his motivation. Counsel, before you run out of time, I wanted to ask you, because you passed over the Schwabe firm also as being unsupported, and the tax court found that Mr. Hornecker discussed the risk of transferee liability with the Marshalls after receiving a legal memo, internal legal memo, that said that they would likely be considered transferees for tax purposes. Do you dispute that that is supported by substantial evidence? I dispute that there is not substantial evidence that they were warned against doing this, and on the Schwabe case, I simply point the court to that letter. I don't have the reference to that. Well, the letter was a follow-up letter, and the tax court didn't rely on that in particular because it said that the follow-up letter didn't cover this, but they said that it was discussed with them. The text, Mr. Hornecker of Schwabe said, this letter was our advice to this client. We repeatedly ---- Well, you're not answering my question. The sentence says that Mr. Hornecker discussed the risks of transferee liability with the Marshalls after having reviewed this internal memo. Is that supported by substantial evidence? That is supported by substantial evidence, but I say I would suggest to you that that is not a warning to him to please don't do this. This is a listed transaction. The documents really are the ---- Well, lawyers don't generally tell people not to do it. They tell them what the risk is. You could go to prison if you do this. You could be liable for taxes if you do this. That's the way lawyers talk, right? Right. They do talk that way. And what Schwabe did, and I would suggest to you that there is error in the record to the extent that that letter is not looked at as the sum total of advice that Schwabe gave them because Mitch Hornecker at Schwabe testified that this is consistent with what we said, so I think that eclipses ---- Well, consistent with what we said is not the same as saying we never said anything additional in our conversations. Except that at the end, what they are saying about that letter from Schwabe is this. That letter at the end of the set ---- It says it's intended to remind your clients of a few of the more significant issues arising from the transactions. It doesn't purport to be a complete laundry list of everything that they were told. But, Your Honor, here's what it says. We're told. It says we're aware of no facts suggesting that Fortran is going to act illegally. The risk of any creditor, including government creditors, even bringing a claim against you is minimal. These three transactions are consistent with established law. So for them to say, indulging your characterization, which I don't quarrel with about that record, hey, this might be like one of these listed transactions or intermediary transactions. But that meant nothing after they had done all this due diligence, all of the parties, all of the due diligence that was done by Schwabe. Did you want to save any rebuttal time? I did want to save five minutes. Well, you're down to a minute and a half approximately. Then I do want to save that. Thank you. Thank you. Thank you. Good morning, and may it please the Court, my name is Nora Bringer, and I represent the commissioner in this appeal. This case involves transferee liability of shareholders after they engaged in a mid-code transaction that stripped assets and cash out of their company and left the company unable to pay its federal tax liabilities. This Court has recently decided two other cases regarding transferee liability of shareholders following a mid-code transaction. That's the second opinion in Sloan and the opinion in Tricarci. In both cases, this Court ruled in favor of the commissioner. This case is not meaningfully distinguishable from those cases. The one distinction is that those did not arise under Oregon law. Yes, that's correct, Your Honor. And so what is your position with respect to the question whether Oregon law would collapse these transactions? Well, I'd like to say one thing before we get to that particular question, if I may, Your Honor, which is that the Oregon UFTA explicitly instructs that it shall be applied and construed to make uniform the law among the states enacting it. It's the provision of the law that the marshals ignore in their briefs, but the Oregon lawmakers were clear that cases from other states should be relevant in determining what the Oregon UFTA means. The government's position is that under Oregon law, this transaction can be collapsed without regard to the party's knowledge or intent of the transaction and its consequences. The Oregon UFTA explicitly incorporates equitable principles and another provision that the marshals ignore in their briefs, Section 95.290. The law specifically states that it incorporates those equitable principles, and in Oregon, those include the substance over form principle. Now, the tax court stated that under Oregon law, the transaction would be collapsed because the marshals had at least constructive knowledge. But we cite a number of cases from Oregon looking to the substance rather than the form of a transaction, and in some of those cases, there's no discussion at all of what the parties knew or intended with respect to discussing collapsing the transaction or, in those cases, looking to the substance of what happened rather than the form. No Oregon case that either party has cited states that knowledge or constructive knowledge is required to apply the substance over form doctrine to recast a transaction. And indeed, two circuit courts, the Seventh and Sixth Circuits, in the Feldman case, which apply the Wisconsin Uniform Fraudulent Transfer Act, and the Sixth Circuit and Billy F. Hawk Trust, which we recently brought to the court's attention through a letter, applying the Tennessee version of the UFTA. Again, thinking about the fact that the Oregon UFTA mandates that the law be applied to encourage uniformity among the states, we suggest that those cases are informative and the correct way to approach the question in this case. The federal cases where constructive knowledge was required, Diebold, Salas-Mundy, and the like, all stem from the Uniform Fraudulent Conveyance Act, which, as we explained in our brief, is a precursor to the UFTA that was enacted in Oregon and more explicitly, in fact explicitly, considers the transferee's knowledge and intent. The UFTA does not do so. But even if constructive knowledge was required, the tax court did not err, much less clearly err, in finding that the marshals had at least constructive knowledge here. The only factual finding that the marshals timely attempt to challenge as clear error, that is in their opening brief, is the tax court's finding that the lawyers or Price Waterhouse Coopers advised them that the transaction was risky. But those factual findings are well supported by the record. With respect to PWC, the tax court found that the accountants told John Marshall that the transaction was similar to a listed transaction or a tax shelter, explained to him what a listed transaction was, and tried to discourage him from proceeding with the sale. That's based directly on testimony in the two trials in this case, which we cite in our brief. The tax court found that John Marshall responded to those warnings with silence. The tax court also found that Dempsey and Weber from PWC tried to convey and here it quoted testimony from Mr. Dempsey, absolute concern over the transaction and the chances that it could be challenged by the IRS. The marshals ignore the tax court's findings that Mr. Weber advised John not to do the proposed stock sale, and as discussed earlier, quoting again from the testimony, this is Weber speaking, in my opinion, I wouldn't take the risk. John Marshall also admitted that Mr. Dempsey never advised him to do the transaction. That's also in the trial testimony. With respect to the lawyers from Schwabe, the tax court did indeed find that Mr. Horniker warned each of the marshals about the risks of transfer liability if MAC failed to pay its debts, which of course is what happened here. That's supported by the trial testimony as well. But there are other factors here that do not involve the marshals' advisors. For example, the price for MAC was inflated, which John Marshall knew and the rest should have known. There are e-mails and testimony showing that the price offered was millions of dollars above the net value of the company after taxes. John Marshall also knew that the purchase price was based on the buyer, Essex, and splitting MAC's tax liability. As the tax court wrote in the Tricarci case, that's the icing on the cake. John also knew that the buyer intended to offset MAC's taxes with the high-basis, low-value assets, and he was leery about that plan. Now these factors are very similar to what this court found to be sufficient in its second opinion in Sloan. On page 1087 of that opinion, this court looked at the fact that the leaders among the shareholders and the advisors knew that the buyers intended to eliminate taxes. This court looked to the fact that the premium was paid over the net value of the company, and that it was calculated based on the estimated taxes the company owed at the time of the sale, and that the buyer provided little information regarding how it planned to eliminate the taxes. The buyer's promises to pay the taxes don't change the analysis. As the Second Circuit explained in Diebold, the taxpayers here should have asked more questions. The Second Circuit wrote that otherwise, an incantation of assignment of tax liability could magically relieve the parties of their duty to inquire. And here the marshals, at the very least, had a duty to ask more questions. Now all of this goes to the knowledge or constructive knowledge that the marshals had on their own, but Oregon law also imputes knowledge of agents to their principles. It's not necessary, but certainly here that provides more support for the tax court's finding of constructive knowledge and for a lack of clear error in that finding. I'll point out that the Oregon UFTA explicitly incorporates equitable principles, including the law relating to principle and agent. We cite a number of Oregon Supreme Court cases that show that in Oregon, knowledge of the agent is imputed to the principle. The idea is that the marshals and not the federal treasury bear the risk that their agents will know something important and not tell them. We've already discussed a number of things that the agents knew, but I'll add one more. This is from the tax court's opinion at 40, or excerpts of Record 40, that PwC knew Fortran in particular had used similar tactics to shelter income and to avoid taxes. And so for PwC, the fact that Fortran was involved heightened their concern about this transaction. So with the transaction collapse, the marshals are substantively liable under the constructive fraud provisions. There's no dispute that the claim for federal taxes arose before the transfer. MAC received less than the reasonably equivalent value for the transfer. The marshals got $9 million more than MAC was worth. And MAC was unquestionably insolvent after the transaction. At the end of the day on March 7, 2003, MAC had $15 million in tax liabilities and just $6.8 million in assets. The marshals are also transferees under federal law, under Section 6901 of the Internal Revenue Code. Now that analysis looks at both objective factors, was there a business purpose, and subjective factors, I'm sorry, objective factors, was there economic substance, and subjective factors, was there a business purpose? The tax court here found that there was neither present in this transaction, and those are factual findings reviewed for clear error. There were no economic effects to this transaction other than creating a loss for MAC and avoiding its tax liabilities. With respect to business purpose, the tax court found that the marshals engaged in the transaction, and I quote, solely to avoid their tax liability. It may have been inartfully stated, but that refers in context to MAC's tax liability. The marshals kept all of the non-cash assets and their newly formed entity. Those are the hard-to-value assets, so there was no uncomfortable family negotiations avoided with respect to valuing assets. The MAC transaction otherwise only moved cash around and then divided it equally between the marshals. That could have happened in a straight liquidation of the company, in which case MAC would have paid its taxes. The marshals raise a couple of issues toward the end of their brief that I'd like to briefly address. The first is with respect to the amount of MAC's tax liability. Now, on that topic, the marshals bear the burden of showing the commissioner's determination of how much tax MAC owed was erroneous. And this court reviews for clear error the tax court determination that they failed to substantiate their claim that MAC's tax liability was erroneous. The only issue raised on appeal is with respect to net operating losses that they claim MAC could have used in 2003. But the marshals don't specify, much less produce evidence to show, what losses allegedly qualify. They don't substantiate the deductibility of those losses. They don't show that the net operating losses weren't already used in other years, and so on. They fall well short of showing that the tax court clearly erred in that finding. The tax court also held that the marshals, not their entity, but the marshals alone, are liable for pre-notice interest. Now, under this court's opinion in Edelson, the more recent extension of that opinion in Tricarci, there's no dispute that Oregon law governs whether they owe pre-notice interest. Under Oregon law, interest is payable on all monies after they become due. The MAC's taxes were due for the tax year at issue here, which ended March 31, 2003, by June 15, 2003. By that point, the marshals had use of MAC's assets that should have been available to pay its taxes. They were transferees under both federal and state law by the date that MAC's taxes were due, and money was due from them as transferees at that point. Under Oregon law, after all, as we explain in our brief, money is due even if no claim has been made. When the IRS sent the notices of transferee liability, thus, is irrelevant. The marshals also raise a concern about the fact that the tax court listed the non-cash assets valued at about $6.7 million for both its decisions with respect to MALLC, the new entity, and with respect to the marshals themselves. As we explain in our brief, Oregon law limits transferee liability to the value of the assets transferred, the total of $28.8 million. The IRS can collect from those assets only once. There are no further questions from the panel. I thank you, and we would ask you to affirm. Thank you. Thank you. Mr. Weaver? Yes, Your Honor. Working backwards, on the interest of the calculation, there is more than enough evidence in the record of the net operating loss, and we would just invite the Court's attention to our briefs there. On the question of pre-notice interest, the Oregon law is that you don't owe that until such time as the debt is due. IRS had six years after we notified them in our own tax returns of what we had done here to go after them under a regular collapsing theory but waited in 2009 to give us notice. It is just a matter of common sense and fairness that we should not be responsible for that tax, for that interest, if we never knew that it was owed. I would tell you that anything Price Waterhouse did is eclipsed by those tax returns prepared, signed, and endorsed by Price Waterhouse in which they said, this is legal and bona fide. We are telling you out of an abundance of caution, the IRS, what we have done here, not because we have done anything wrong, but just because we want to let you know that. That was the advice Dempsey got from his front office. It was not to do the deal and disclose. And when they disclosed, that distinguished these taxpayers from every other one in these MIDCO cases. No tax cheat says to the IRS, come and audit me. I probably did something wrong here. So I think that eclipses everything, and I think that the tax court didn't pay any attention to that, and I think they minimized that letter. That is a standard letter that a lawyer would do at the end to say, here is what I have been telling you all along. And that's what Mitch Horniger said. And I'm just about out of time here. I am. But I would just say this. You know, the question on these things is, would further inquiry, even if this was an inquiry notice date, would further inquiry lead these taxpayers, who I guess they're suggesting should have been second-guessing their lawyers, would lead them to discover that these taxes would never be paid? Would a reasonable inquiry lead to more knowledge that would tell you that taxes would not be paid? And the answer to that is clearly no. Fortran was lying to everybody. Thank you, counsel. Your time has expired, and I think we understand your arguments. The case just argued is submitted, and we do appreciate very much the helpful arguments from both counsel.
judges: Tashima, Graber, Owens